IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **EDDY CLARK,** )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>**MATTHEWS INTERNATIONAL** )<br>**CORPORATION,** )<br>)<br>Defendant. )<br>)<br>) | Case No. 4:07-cv-2027 (SNL) |

## PLAINTIFF'S TRIAL BRIEF

Comes Now Plaintiff, Eddy Clark ("Clark"), by and through counsel, and pursuant to the Court's Case Management Order dated April 21, 2008, submits his Trial Brief in the above captioned matter, and states:

### Introduction

Clark worked for Matthews International Corporation ("Matthews") since May 18, 1992 as an electronic graphics artist. Matthews is a Pennsylvania corporation with its principal place of business in Pennsylvania and with offices and doing business in this judicial district. It operates a division that does printing and primary packaging nationwide. Starting in 2006 through January 31, 2007, Matthews had a reduction in force ("RIF") at the St. Louis facility which led to Clark's termination. Clark was terminated from Matthews on January 31, 2007, when he was 57 years old. After receiving a "right to sue" letter from the Missouri Commission on Human Rights, Clark filed his Complaint in the case on December 6, 2007. The jury will hear Clark's claims brought under the Missouri Human Rights Act ("MHRA"), §§ 213.010 to 213.137.

{00028663.DOC}1

Clark asserts that Matthews conducted age-based segregation and discrimination, including segregating employees in the protected age group (over the age of 40) in teams according to age; restricting employees in the protected age group to the oldest, slowest equipment; limiting their access to new software, and not providing them training. Clark further asserts that his age was a contributing factor that led to his termination.

**The Artists Were Segregated By Age**

Clark's supervisor, Randall Peek divided the artists in teams in 2001. Prior to 2001, there was no individual designation, and they were all in one art department. The Blue and Red teams were where Peek placed the older artists. The Purple Team was comprise of the younger artists ("Younger Artists"). Initially, two out of three artists put on the Red Team were older artists, Bob Folis, born in 1950, Lillian Spruill, born in 1957. The one younger artist initially assigned to that team, Gene Otte (born in 1969) *was subsequently moved by Peek to* the Purple Team. The Blue Team had the two oldest artists, Foster and Clark. The third member of the team was Lyne Oder, born in 1960. *Id.* (She was 46 when she was terminated by Matthews in 2006).

The Purple Team was comprised of Younger Artists including: Jane Willdering (born in 1972), Anthony Snider (born in 1973) and Mike Deloff (born in 1963). Subsequently, additional Younger Artists were added to the Purple Team including Nischbach (born 1971) and Otte (born 1969).

Within the teams, Peek demonstrated favoritism by age. Peek picked the youngest member of both the red and blue teams to be team leaders. Initially, Lyne Oder, born in 1960, was picked to be the Red Team leader and Gene Otte (born 1969) was made the Blue Team leader. After Oder was terminated in 2006, the artists were segregated into two teams, one the Red/Blue Team comprised of Clark (born 1949), Foster (born 1946), Spruill (born 1959) and

{00028663.DOC}2

Follis (born 1950), Prinster (born 1965), ---and the Purple Team comprised of the younger artists, Otte (born 1969), Nischbach (born 1971), Willerding (born 1972), Hoef (born 1974).

Older Artist Jim Morrison was assigned to the Purple Team in the beginning of 2007 as "team leader", but was immediately terminated approximately two weeks thereafter in the January 2007 RIF. *At the time of his termination, he was the oldest member of the Purple Team.*

Peek claims he did not retain any notes confirming his justifications for moving the younger people into different teams. Further, Matthews did not provide a single document confirming *how* the decisions were reached as to who was put into which team.

### Mathews Demonstrated Discrimination Against the Older Artists

Peek maintained that employees were assigned to the Purple Team because they possessed certain skills (e.g. multi-color trapping) and other employees in the department did not. However, Clark was capable and experienced in doing the multi-color trapping, the type of work done by the Purple Team. Clark did multi-color trapping on a regular basis before the teams were set up. Further, Tom Foster (born 1946) had been doing multi-color trapping before Peek divided the employees into teams. The placement of Nischbach on the Purple Team undermines Matthews' assertion that one needed a special set of artist skills to be on that team as Nischbach *had no artist experience* at the time Peek put him on the Purple Team.

### Older Artists Were Given Poorer And Ineffective Computers

Between 2000 and 2007, all graphic artists were working on computers. Peek admitted that the computer was any artist's primary working tool. Younger Artists received preferential treatment in the form of computer training and receipt of better computer equipment.
Peek provided the Purple team "top of the line" computers with more memory than the computers received by the Blue and Red Teams. The Purple Team always received the first

upgrades to the newest faster models. Older Artists were given slower hand-me-down computers without the capabilities of the Younger Artists' computers. Follis, Spruil, Foster and Clark were at the bottom of the chain for receiving hand-me down computers.

Clark's computer would also "lock up quite often." When Matthews added software to Clark's computer, it ran slowly. Large jobs would "bog down." Clark's computer seized up due to their having insufficient memory. Clark complained about the slowness of his computer, and that his computer took longer to save work performed. Peek responded to Clark's by promising Clark new equipment (promises never fulfilled), and by suggesting that Clark use the Younger Artists' computers when the Younger Artists were on breaks. Despite the complaints raised by Clark, Peek never asked Koprek, the Computer graphics system administrator, to improve Clark or Foster's computers. Rather than providing a faster computer to Clark, Peek issued an order to Koprek *to remove* some of the memory cards from Clark's computer and put it in Younger Artist Eric Nischbach's computer. At the time Peek ordered Koprek to take memory out of Clark's computer, Peek was aware that it would slow Clark's computer down and directly impact Clark's productivity.

### Older Artists Were Not Given The More Productive Software

Younger Artists had faster and more productive software, including Photoshop, which the older artists, including Clark, did not have. Clark testified that he needed to use Photoshop as a tool for some of his duties, but the only time he could access it was on Purple Team computers when Purple Team members were out during their ten minutes breaks. Further, Matthews started using software known as ArtPro after the artists were divided into teams. The young Purple Team received the ArtPro software, which was not provided to older artists such as Clark.

### Older Artists Were Given Less Training

{00028663.DOC}4

Younger Artists on the Purple Team, including Jane Willerding, Eric Nischbach, James Hoef and Gene Otte also received ArtPro training to make them more efficient. Clark and Foster were denied such training. Clark specifically requested that Matthews train him in ArtPro in his 2005 review, and Peek denied his request. Clark was given little or no training on other software, although Purple Team members received such training, including, but limited to, color specialty type training, Calcomp printer training, film processing training, and electronic email job training.

### Matthews Consistently Showed Bias In Favor of Younger Artists And Against Older Artists

Peek showed favoritism to the Younger Artists. Peek once commented to Foster during a smoke break that the younger artists were entitled to special favors because "young people learn quicker." Clark testified that Willerding, Otte, Hoeff, Nischbach and Burris received special treatment, individualized training in which they learned short cuts and multiple techniques to do jobs; and training at multiple sites in California, Illinois and Pennsylvania. Koprek confirmed that Younger Artists Otte and Willerding got faster service from Peek, including demands that Koprek "drop what you are doing" to service those Younger Artists. The Purple Team was granted "flex hours." By comparison, Peek would not allow Clark to come in late even on a day when Clark called with a concern about icy roads near his home.

Harsher standards were maintained for the older employees. Peek would not allow Clark to leave early to sign his taxes, but younger artists were always granted time off for similar concerns, like doctors appointments.

### Older Artists Were Singled Out for Error Monitoring

In 2005, Peek had employee Steve Coffman keep track of Clark and Foster's error rate, and when Clark asked Coffman, "is it just me and Tom he was keeping a record of," that

{00028663.DOC}5

Coffman replied "yes, nobody else." By contrast, the Younger Artists were allowed to self-monitor their mistakes.

### Mathews Created Rules For Older Artists That Slowed Their Productivity

Older Artists were trained and told by Matthews to plot their art in a more time consuming manner than the methods provided to the younger employees. During a 2006 review, Peek told Clark he had to do one job at a time, instead of having two jobs open at one time, and further that he could not work on another job while a job was going through the printer. However, on Clark's evaluation, Peek wrote critically as to Clark having <u>only one job open at a time.</u> Peek further deducted points from Clark's evaluation for having two jobs open at one time. The limitation placed on Clark to have one job open at a time hampered his productivity compared to those who were not similarly hampered.

Matthews' personnel policies provide that seniority would be the determining factor when past performance, job knowledge, and skills for performing those jobs were equal. Because Matthews failed to train Red and Blue Team members and because Red and Blue Team members were required to use older, slower computers and insufficient software, employees with greater seniority could not *by definition* have the job knowledge and skills to perform those jobs not eliminated.

### Matthews Demonstrated Other Forms Of Hostility To Older Artists

Matthews demonstrated its hostility to employees in the protected age group including comments about retirement and attempting to force an artist in the protected age group into retirement. Matthews sent employees in the protected age group, including Clark, letters offering unrequested membership to the AARP. Said letters were given out before the terminations at issue. Artist Foster testified that Peek called Foster into Kerry Beaver's office for a three person

{00028663.DOC}6

meeting to discuss their suggestion of Foster's early retirement, even though Foster gave no indication of and had no intention to retire. During the period in which Matthews was considering who to terminate for the January 2007 RIF, Clark's supervisor made a comment to Clark stating: "Ed, Just trying to make it to retirement?"

### The 2006-2007 RIF Reflects A Bias Against Older Employees

Commencing in August 2006 Matthews terminated the following employees at the St. Louis facility:

| | | |
|---|---|---|
| Vicki Bates | born 1950- | Terminated 8/18/06 |
| Jacob Lutz | born 1966- | Terminated 9/8/06 |
| Jacqueline Steed | born 1960- | Terminated 10/5/06 |
| Jason Pickens | born 1974- | Terminated 10/6/06 |
| Lynn Oder | born 1965- | Terminated 10/6/06 |
| Gary Smith | born 1942- | Terminated 10/27/06. |

On January 31, 2007, the following employees were terminated from Matthews:

| | |
|---|---|
| Ed Clark | born 1949 |
| Tom Foster | born 1946 |
| John Hardy | born 1958 |
| Jim Morrison | born 1960 |
| Donald Barton | born 1959 |
| Jan Koprek | born 1956 |
| Jason Runge | born 1955 |
| Ron Styles | born 1953 |
| Steve Anderson | born 1955 |

With the single exception of Pickens, which was born in 1974, all of the terminated employees were in the protected age group. After January 31, 2007, Matthews retained the following employees in the Graphics Division:

Jane Willerding (1972)
James Hoef (1974)
Jennifer Mersinger (1974)
Eric Nischbach (1971)
Jeff Burris (1970)
Gene Otte (1969)
Kenneth Tinker (1969)

{00028663.DOC}7

    Bob Follis (1950)
    Lillian Spruill (1957)
    Michael Blakeney (1956)
    Mark Slater (1956)
    Michael Thornsberry (1962)
    Michael Deloff (1963)
    Cindy Prinster (1965)
    Duane Marburger (1966)
    Charles Penn (1959)
    Susan Bobe (1966)"

  At the time the 2006-2007 RIF began, all of the employees on the Red Team and Blue Teams (the Blue Team was combined into the Red Team) were in the protected age group. At the time the 2006-2007 RIF began, none of the employees on the Purple Team were in the protected age group.

  The relevant pool of workers considered for the 2006-2007 RIF consists of all of the non-management employees at the St. Louis facility. Prior to the 2006 and January 31, 2007 RIF terminations, the St. Louis Graphics Division employed 49 non-management employees, 40 of whom were over age forty. After the January 31, 2007 terminations, the St. Louis facility employed 34 non-management employees, 26 of whom were over age forty. In the 2006-2007 RIF events, the percentage of non-management employees over age forty dropped from 81.6% prior to August 18, 2006, to 76.5% after January 31, 2007.

### A Close Review Of The 2006-2007 RIF Shows Age Bias

  Randall Peek, the supervisor in the St. Louis Graphics Division art department and Kerry Beaver, a company vice president made the decision as to who would be on the termination list. Matthews admits that it neither retained nor generated any documents that indicate why Clark and Morrison were put on the termination list. (Peek claims he did not discuss his termination decisions with anybody in the Matthew's headquarters in Pittsburgh. Peek testified that he did

not go through employees' evaluation records, error logs or personnel files, or look up the employees' histories, past performance information or disciplinary reports during his termination decision process.

Employee Nischbach (born 1971) was moved to the art department from film processing and placed on the Purple Team in 2005. He had no prior experience with the type of work performed by the Purple Team, and had to be trained to become proficient in the work performed by the Purple Team. Nischbach was on an original termination list for January 31, 2007 created for the January 2007 RIF, and Ed Clark (born 1949) and James Morrison (born 1960) were not. Matthews decided to keep Nishbach and to terminate the older Clark and Morrison. Approximately two weeks before the terminations on January 31, 2007, Morrison was made the team leader of the Purple Team (Otherwise the Purple Team was comprised solely of individuals not in the protected age group). Team leaders were chosen for their experience with the work being performed. In order to be a team leader, an artist had to be "the most knowledgeable" and/or "most experienced." Matthews cannot provide rational justification as to why Nishbach was maintained over the team leader Morrison and Clark.

Artist Hoef, not in the protected age group, had lower evaluation scores than Clark's during the same period. Hoef's 2005 evaluation showed numerous complaints by the customers, and that he "had a negative attitude." (Id). Hoef's supervisor signed a form in 2005 noting that Hoef needed to improve his starts, sick days, attitudes, and relationship with fellow workers. Matthews acknowledged Hoef had a tardiness problem. Matthews admitted that Hoef was ineffective in working with his team mates. Notwithstanding, Hoef was retained over Clark.

Clark's supervisor did not recall a single instance from 2005 to 2007 in which Clark was singled out for any criticism. Matthews did not perceive Clark's 2006 performance review as

negative.). Matthews admitted that Clark's review did "meet the standard."

Matthews claims that it retained documents concerning the error rates of all employees, and "Checking Error Logs." Only one checking log was produced. In said log, Clark scored better than certain of those employees which were retained by Matthews.

**Potential Witnesses**

Clark will testify regarding the facts that led up to his termination. In addition to Clark, who will testify to the facts detailed above, the following individuals will likely testify:

Kerry Beaver, a former manager in the Matthews St. Louis office, was one of two managers who addressed Clark's termination prior to January 31, 2007.

Randall Peek, the Matthews' Midwest Region manager, managed the St. Louis Graphic Division's Art Department; organized the artists into color coded teams, selected Clark's placement in the Red Team, participated in management decisions effecting Clark; reviewed Clark; and participated in decision to terminate Clark. He further made derogatory comments about Clark concerning his retirement during the time period decision was made to terminate Clark.

Deena Zadylak, the Corporate Human Resources Director of the St. Louis Facility, which works out of Matthews Pittsburgh corporate offices. Zadylak was responsible for reviewing the individuals selected for the 2006-2007 RIF. Zadylak participated in answering the company's interrogatories and in addressing matters regarding Matthews' investigation during EEOC and MCHR inquiries.

Tom Foster, worked along-side Clark in the Red team, and was in the protected class at the time of his termination. He is capable of addressing the treatment that member of the protected age group shared prior to the January, 2007 termination.

Janet Koprek, a co-employee of Clark, also in the protected age group at the time of her termination, may testify, as to the state of the environment that members over the protected age group had experienced. Koprek was responsible for many essential IT matters. She will confirm the unequal treatment that employees over the protected age had to address in relation to their computers.

## LEGAL DISCUSSION

    I.    The Missouri Human Rights Act's "Contributing Factor "Analysis Governs Clark's Claims

The law is clear that the MCHR "safeguards are not identical to the federal standards and can offer greater discrimination protection." *EEOC v. Con-Way Freight, Inc.*, 2010 U.S.App. Lexis 19638 (8th Cir. 2010). In particular, the MHRA protects against "any unfair treatment based on …age…as it relates to employment." *Daugherty v. The City of Maryland Heights*, 231 S.W.3d 814, 819 (Mo. 2007). Further, Missouri Courts have explicitly rejected the federal burden-shifting analysis and the ADEA's more stringent "but-for" test. *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 664-665 (Mo. 2009). Rather, to succeed at trial under the MHRA, Clark must simply show that his age was a "contributing factor" in Matthews' decision to terminate him. See, *Daugherty*, 231 S.W.3d at 820. The 8th Circuit Court of Appeals further confirmed this point in the ruling upon the appeal of the instant matter:

> The MHRA and the ADEA are worded similarly. Both statutes generally prohibit employers from discriminating against their employees "because of" their age. 29 U.S.C. § 623(a)(1); Mo. Ann. Stat. § 213.055(1). Under the ADEA, the United States Supreme Court has stated that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2350, 174 L. Ed. 2d 119 (2009). Under the ADEA, "therefore, a plaintiff must prove that age was the 'but for' cause of the employer's adverse decision." Id. In our prior opinion, we explained that this meant that Clark had to

{00028663.DOC}11

"show that if it were not for his age, he would not have been terminated and he would have become a primary-packaging designer."

**Under the MHRA, however, Clark is not required to prove that age was the "but for" cause of Matthews's adverse employment actions.** According to the Supreme Court of Missouri, "[n]othing in [the] statutory language of the MHRA requires a plaintiff to prove that discrimination was a substantial or determining factor in an employment decision; if consideration of age . . . contributed to the unfair treatment, that is sufficient." *Daugherty v. City of Md. Heights*, 231 S.W.3d 814, 819 (Mo. 2007). **The Missouri Court of Appeals has defined a "contributing factor" in this context as one "that contributed a share in anything or has a part in producing the effect."** *Williams v. Trans State Airlines*, 281 S.W.3d 854, 867 (Mo. Ct. App. 2009) (internal quotation marks omitted). Recent Supreme Court of Missouri case law supports this definition. *Fleshner v. Pepose Vision Inst.*, 304 S.W.3d 81, 94 (Mo. 2010) (noting that "cases involving . . . the MHRA . . . turn on whether an illegal factor played *a role* in the decision to discharge the employee" (emphasis added)). Essentially, as we noted in our prior opinion, "the difference between the ADEA and the MHRA is that the former requires that age must have been 'the reason' for the adverse employment action, while the latter merely requires that age was 'a reason' for the action." *Clark*, 628 F.3d at 472; see also *Baker*, 581 F.3d at 689-90 [**17] (noting that the Supreme Court of Missouri has "held that the MHRA is less demanding than the ADEA").

Clark, 628 F.3d at 469. *Clark v. Matthews Int'l Corp.*, 639 F.3d 391,398 (8th Cir. Mo. 2011, emphasis added).

Matthews claims multiple affirmative defenses in this matter, a majority of which make some variation of the defense that it considered factors other than age and would have made the same decision to discharge Clark regardless of discriminatory motive. As addressed above, such defenses are not applicable under the MHRA for they do not comport with Missouri law- which acknowledges that a decision to terminate an employee is rarely based on a single "but-for" factor. Indeed, Clark is entitled to judgment in his favor if he can prove by direct or circumstantial evidence that his age was just one of many contributing factors for Matthews'

{00028663.DOC}12

actions, regardless of whether other factors also exist which would have led to the same decision. See, *Stanely*, 263 S.W.3d at 804.

### A. Damages

Under the MHRA, Clark is entitled to actual and punitive damages, court costs, and reasonable attorneys fees. § 213.111 RSMO. Clark prays for judgment for: back pay and lost benefits, front pay, compensatory damages, punitive damages, attorney fees and the costs and expenses of this action.

Clark has been unable to secure employment in the printing field since his termination by Matthews. He was forced to fall back on his military training, and sought employment as a security guard. He is currently employed by Cape Albeon (a charitable hospital) and Whalen as a security guard, making a fraction of the amount he earned at Matthews. Clark last earned $18.36 per hour at Matthews. ($38,188.80 annually, without overtime factored, which was time and a half ($27.54 per hour)). Clark's tax records confirm that he received varying additional amounts for overtime every year. His annual 2003 income was $39,739. His annual 2004 income was $42,070. His annual 2005 incomes was $43, 951. His annual 2006 income was $39,283. The average income of the last four years was $41,260.75. Clark's back pay claims exceed **$ 105, 064.74** before interest is considered.

Clark further lost his insurance when he was terminated, effective February 28, 2007. Matthews assessed his COBRA costs to be $1,056.72 per month in health benefits and $ 49.19 per month in dental benefits. He seeks damages for the six months he was without those benefits. Clark receives insurance with his new employer. However, the new insurance has a $1000 deductable, and Clark's insurance with Matthews had no similar deductable. As a result, Clark is asking for an additional to cover the cost of the deductable until he is 67.

In addition to actual damages, Clark is entitled to equitable relief under the MHRA. *See*, *Gilliland v. Mo. Ath. Club,* 273 S.W.3d 516, 524 (Mo. 2009). Reinstatement is a considered remedy to make the victim of discrimination whole. However, where reinstatement is not feasible, such as in the case where the relationship between the employee and employer cannot be repaired, the court then has authority to award front pay as an equitable remedy. *Id.* Clark is currently 62, and should be expected to continue working until age 67. **Being equitable in nature, the decision to award reinstatement or front pay is within the discretion of the Court, not the jury.** *Id.*

In addition to actual damages, Clark is seeking punitive damages. Under the MHRA, a plaintiff is entitled to an instruction on punitive damages if he can provide clear and convincing proof "of a capable mental state, either from wonton, willful, or outrageous act, or from reckless disregard for an act's consequences such that an evil motive may be inferred." *Alhalabi v. Mo. Dep't of Nat. Resources,* 200 S.W.3d 418, 529 (Mo.App.Ct. 2009). A plaintiff may show a wonton or evil motive by demonstrating that the defendant intentionally committed a wrongful act, "and knows at the time the act was wrongful." *Claus v. Intrigue Hotels, LLC*, 2010 Mo.App. Lexis 1777, 7 (Mo.App.Ct. 2010), quoting *Williams v. Trans states Airlines, Inc.*, 281 S.W.3d 854, 870 (Mo.App. Ct. 2009). Further, the knowledge of the supervisor taking the wrongful action will be imputed to the corporation. *Alhalabi*, 300 S.W.3d at 529. In the instant case, Clark will present evidence demonstrating that at the time Matthews used Clarks' age as a contributing factor in selecting Clark for layoff, Matthews knew that such actions constituted illegal discrimination.

Finally, Clark is entitled to reasonable attorneys' fees. Section 213.111 RSMO. States that a court "may award court costs and reasonable attorney's fees to the prevailing party." The

Missouri Supreme Court has interpreted § 213.111 as being "structured to recognize attorneys' fees as a matter of course to the prevailing claimant," and that "the amount of the verdict or judgment may have little bearing on the amount of attorneys' fees." *Gilliland, v. Mo. Ath. Club* 273 S.W.3d 516, 523 (Mo. 2009). "If a court determines a plaintiff has prevailed it should award attorney's fees "unless special circumstances would render such an award unjust." *Lippman v. Bridgecrest Estates I Unit Owners Assoc., Inc.*, 4 S.W.3d 596, 598 (Mo. App. E.D. 1999). This exception is "extremely narrow" and applied "only in unusual circumstances and then only upon a strong showing by the party asserting it." *Id.* A showing of "outrageous" or "inexcusable" conduct by plaintiffs (or plaintiffs' counsel) during the litigation of the case" has been held sufficient to warrant a finding of "special circumstances." *Id.*

While attorneys' fees should be awarded as a matter of course to a prevailing plaintiff, the MHRA provides that "a prevailing respondent may be awarded court costs and reasonable attorney fees only upon a showing that the case is without foundation." § 213.111 RSMO. **Whether to award attorneys' fees, and the amount of attorneys' fees is for the trial court, and not the jury,** to decide. Clark's attorney fees cannot be fully assessed as of this date, because they are continuing to be incurred. According to Missouri Law, Attorneys fees are to be calculated according to the lodestar method, the amount to be determined by the Court.

Respectfully Submitted by,

/s/ Joshua Avigad

Lawrence P. Kaplan
Joshua M. Avigad
KAPLAN ASSOCIATES, LLC
Attorneys for Plaintiff

{00028663.DOC}15

                                                101 South Hanley Road
                                                Suite 1225
                                                St. Louis, Missouri 63105
                                                Telephone: 314.863.2929
                                                Facsimile: 314.863.9777

Attorneys for Eddy Clark

## **CERTIFICATE OF SERVICE**

    I hereby certify that on this 24th day of August, 2011, the foregoing was filed electronically with the Clerk of Court to be served on all parties by operation of the Court's electronic filing system.

/s/ *Joshua M. Avigad*

{00028663.DOC}16